Case number 13-3074 et al. United States of America v. Christian Fernando Borda, also known as Tony Appellant. Elizabeth Brandenburg for Appellant Borda, Carmen Hernandez for Appellant Alvarin-Velez, and Kirby Heller for Appellees. May it please the Court. My name is Elizabeth Brandenburg for Appellant Christian Borda. This case is about a lack of evidence as well as the failure to admit several pieces of relevant evidence on the crucial question of whether or not my client intended to import drugs into the United States. With just ten minutes, if the Court would like me to discuss the facts, I'd be happy to do so. Otherwise, I'd like to jump right into... I think you should just jump in, and if we have fact questions, we'll ask them. Thank you. First, I'd like to address the government's recently filed 28-J letter regarding the circuit's decision in the Vega case in June of this year. The Vega case deals with several of the issues that we've raised in our appeal, and I'd like to address how it can be distinguished and how it's helpful to our case. First of all, the Brady issue. In our case, there was years of litigation regarding the government's obligations under Brady and its failures to turn over evidence in a timely fashion for it to be used in Mr. Borda's defense. The Vega case is also an importation case out of Colombia, dealing with a FARC guerrilla operation in Colombia who were producing drugs, cocaine, to be brought to the United States. And the evidence at issue in that case was a single photograph with... someone else who was identified by the same nickname as Mr. Vega, Chiguero, which is actually a large rodent, similar to the capybara is what I was familiar with from Brazil, so something of a common nickname. And in that case, the government or the court held that this evidence, this photograph of this individual, other than Mr. Vega identified by the same nickname, was not prejudicial in not being admitted, even if Brady was violated because there was much other evidence to support Mr. Vega's conspiracy and participation in the importation conspiracy. He was identified both by the nickname and identified in person as having been involved in the transportation of drugs and weapons. And that's simply not what we have in this case, where the main issue, in fact, had such a dearth of evidence that was admitted to show whether or not Mr. Borda, his co-defendant, knew or intended for drugs to be imported to the United States. The evidence that violated Brady that should have been admitted was statements by the government's own cooperating witness. Is that the Skidmore report? Yes. Okay. I was a little confused about one thing in your brief. Setting aside the Skidmore report, are there other DEA-6s that were not turned over or were they just turned over late? There were other DEA-6s that were not turned over. Were they turned over at all? They were turned over late, after trial. I believe 86 were turned over in regards or in response to the court's order after trial. That came up from just a luck event where my client happened upon some information while he was incarcerated of things that other people knew about Junior, the informant in this case. But is the Skidmore report the only one that you briefed that was turned over after trial? No, there were others turned over. That's the one that we briefed that was the most crucial bit of evidence that was prejudicial and it's not being available and turned over and then admitted at trial. The evidence would have supported the issue that was in dispute, that Mr. Borda did not know that drugs were coming to the United States. The government says that's one interpretation of it, but you could read it and see another interpretation and that agent testified and gave the other interpretation of it, right? That's correct. And that's what the district court found to be the credible interpretation or at least if the report was reflecting what was told to the agent and the agent testified to that and the court credited that, then how are we to conclude differently? Well, Your Honor, I believe that our contention is that the jury should have made that determination, that even if there is evidence to contradict this evidence that we contend is admissible and should have been turned over and then admitted, that there's no standard or requirement in the law that there can't be contradictory evidence. And Skidmore could have testified the way she interpreted what she heard from her informant. That assumes that these out-of-court statements would have been admissible under some hearsay exception. Yes, that's correct. And that hearsay exception being that the junior, the informant, was a party, an agent of the government, as a party opponent. So if we don't agree with you on the admissibility of this, then we don't even really need to get to Brady, right? Correct. Because it couldn't come in at all. The evidence would have to be admissible in order to be prejudicial under Brady. And our contention is that it is. In this circuit, the government has been held to be a party opponent, and so statements of government agents can be admitted against the government. Is there any case other than Morgan where we've held that? No. And Morgan deals, doesn't deal with, it deals with party opponent, but not with an agent of the government. Morgan dealt with the adoption of a statement and not with them being an actual agent. We've argued that the Sixth Circuit's approach in the Branham case is persuasive because where the government cultivates a relationship with its informant and depends on what the informant says, and the informant is then cultivating their relationship with the defendant in the case, that there are certain guarantees of trustworthiness about that. If the government is depending on this informant in its investigation and its actions, then their government or their informant's statements should also be admissible. It seems like if we hold that, then we pretty much open up the floodgates to admissions by party's opponents in your run-of-the-mill criminal cases because they all rely upon informants. Many do. That's correct. I don't think it will open the floodgates, however, because it's not necessarily your typical case where your informant is telling the government things they don't want to hear. And that's what happened in this case, and that's why these statements should have been admitted from our perspective in Mr. Gordo's defense. If the informant is trying to curry favor with the government, trying to work with the government for his own good, then him telling the government things that are not helpful to that end, but are actually exculpatory information for the defense is a further guarantee of its trustworthiness. And I don't think that it would open the floodgates because it doesn't serve the informant's own end. The Vega case also addressed the instruction issue regarding the taking out of evidence of certain exhibits that were removed from the jury's packets, but was not specifically instructed, the jury was not specifically instructed not to consider the testimony about these statements, which were further connections to the United States, trying attempts by the government to connect Mr. Gordo and his intent to the United States. The district court ruled that these parts of the discussions, the wiretaps and taped discussions, were not admissible and had the jury rip them out of their binders, but did not tell the jury what they were not considering. But that's not completely fair to the district court here. The district court said these particular exhibits, which were the English translations, right, of the actual tapes, so the jurors never got the tapes, they just got the translations, and then the translations were taken away from them. And the judge, didn't the district judge also say any testimony related to these exhibits is stricken? The district judge said that they were stricken and should not be considered, but the jury, this is a week and two weeks respectively after these exhibits had been testified to, and there was testimony regarding them, and the jury didn't have the information that they needed to know that what was in their own memories was not something that they could consider, just having ripped it out of their notebook was not enough. And the Vega case has a specific instruction. I guess I want you to answer my specific question, which is did the district court say strike testimony relating to these exhibits? I believe so. I apologize to the court on that specific, whether testimony was specifically mentioned or not. I think the gist of it was that, and that was the court's intention, was to strike the testimony. But if the jury doesn't know what testimony that is. So the district judge is supposed to go back and catalog the specific testimony that is being stricken for the jury? You're saying that our case law requires that? Well, in a case of this magnitude, of weeks and weeks of testimony, breaks that the jury took, I think not telling them what was being stricken weeks later, which is not the typical occurrence of things coming back weeks later and being stricken, that if we are going to instruct the jury not to consider something, then they should know what they're not considering. Thank you. Mr. Hernandez? Good morning, Your Honor. If I may, I would like to follow up on the question Judge Wilkins was asking about the instructions that the judge gave to the jury. The defense at trial asked the judge to give a very specific reference to the evidence that was being referred to.  We were not asking the judge to go on and on or to dig in. We asked the judge to specify, because there were conversations in Spanish, translations. The trial went on forever. There was like a two-week gap, and there had been a lot of objections to the evidence. I'm bilingual, and it's often difficult to follow at trial when you've got this issue of foreign audio tapes. So this was not sort of an open-ended request of the district court. This was a request for, please identify the evidence that is being stricken by, you know, three sentences, so that at least the jury, if it was able to follow. Is there any case that supports, that would have required the district court to do that? As counsel for Mr. Borda said, I don't think, I haven't found any, Your Honor. I must say these extradition cases into the United States present really difficult and different issues for the court. And as a matter of due process, if these men are going to be tried in this district, then the court ought to be sort of solicitors of their rights to some extent and understand that these cases present very difficult issues for a jury to follow. Multiple names in Spanish, nicknames, facts, everything in a foreign country. And, you know, if there is no case, I would ask the court to be the first. Okay. Your Honor, this case was, in essence, in a conspiracy case, it was different from a lot of cases. Often, you know, the government's theory in a conspiracy case is, you know, there's never, we can't prove it, we have to prove it by inferences, no one was present. This was a case where the government had cooperating witnesses inside the quote-unquote conspiracy from day one. They were audio taping a lot. The main witness, who knew he was being recorded throughout the meetings, the conspiratorial meetings, took the stand, was on direct for multiple days, and never mentioned this 200 kilo quantity until the last question on cross-examination, multiple-day cross-examination. And the government was sitting there with an 11-page DEA-6 that said, unbeknownst to Borda, the main defendant, the cooperator number two, by the way, at this point it's cooperator number two, sent 100 kilos to Houston and something else with the other 100 kilos. Brady is a rule, not a rule of discovery, it's a rule of fundamental fairness. And at least the Second Circuit in Licca versus Portuando reversed on a 2255, where the government didn't produce exculpatory information. And what the court in that case said was that Brady does not simply guarantee a perfunctory transfer of information, and the limited Brady materials could have led to specific exculpatory information only if the defense undertook further investigation. We left that testimony, the 200 kilo testimony, untouched because it had not been in any of the DEA-6s, had not been testified to on direct, we didn't know where it was going. If we had been sitting there with a DEA-6 that said what that DEA-6 said, we could have confronted that witness, at least refreshed his recollection. And it didn't have to be his statement for us to refresh his recollection. The problem, though, is that the DEA-6 doesn't say exactly what your theory is. It just says that 100 kilos was fronted to, I'm trying to remember the name of the individual, and then basically that they took another 100 kilos, stole another 100 kilos, and took that to the U.S. unbeknownst to them. But it doesn't say that the 200 kilos that you're saying was brought up in cross-examination, that that's the same 200 kilos that was taken unbeknownst to Borda, to the U.S. That's for a trial, and that's for a defense attorney to explore. And had we known that in advance, we would have done a lot with it. And it's significant that 200 kilos is the same quantity that the district judge finds as the relevant conduct quantity for sentencing. It's the only evidence in the whole trial, even though they had one cooperating witness from the beginning and other cooperating witnesses. It's the only evidence in the entire trial where anyone testified drugs entered the United States. I know they don't have to prove drugs entered to the United States. I know the standard is knowing or intending. But going back to knowing or intending, the cooperating witness testified for days, and the testimony was undisputed that the intent was to ship into Mexico. The government can say geography is all it is, and this leads it all, all the trial errors that we challenge, all revolve around this importation issue. Again, it goes to the government's closing argument when they stand there in rebuttal, when we can't get up and say anything, and talk about bees in a box. This is a specific intent crime conspiracy. This case is distinguishable from Vega because the judge in this case, in ruling on the motions for new trials, said that the case was a close case. Never said it was an overwhelming case. And again, the government's thrust throughout the whole case is, hey, they were in Mexico, so they had to come to the U.S. And maybe 20 years ago that was true, maybe 10 years ago that was true, but the evidence, including some of the evidence that was not introduced, is that Mexico is no longer a passageway to the U.S. They ship overseas, including Mr. Borda's. The testimonies, or the evidence, and the DA6s, some of which was not allowed in, is that Borda had business in Europe, and it transported through or trans-shipped through Mexico. So that 200 kilos went to the heart of the government's case, went to the heart of our case. And for the government to sit there and stamp it as draft, I've been practicing for many years. I mean, the hearing after the fact, I mean, Agent Skidmore confirmed all of that, right? Well, Agent Skidmore could have testified before the jury and have the jury decide whether it's draft. And it doesn't matter whether it's draft or not. The point is... Why doesn't it matter whether it's draft? Because any statement made by... any statement that's relevant to guilt or innocence or that's favorable to the defendant, whether it's a draft, whether it's, I think, I'm not sure, I'm not 100% sure, it doesn't have to be a sworn affidavit for it to be discoverable as Brady. Even if Skidmore... I mean, I understand that. It can be detective notes. Those are turned over as Brady all the time. I guess my point is that you're making it as if this document itself would have been admissible. And the fact that it's a draft further implicates the whole admissibility issue. I don't agree that for it to be Brady it has to be admissible. As I say, the Second Circuit... Well, I understand that it doesn't have to be admissible to be Brady, because if it were turned over pretrial, then you can take a document that's hearsay and non-admissible and use it for investigative leads, et cetera. But here we have something that is post-trial, and we're trying to see whether the outcome reasonably would have been different. Right. So if it's not admissible, then how could the outcome have been different? What would you have done with the document had you had it before trial that would have made the outcome different? Our opening statement would have been different. Our cross-examination of the witness would have been different. When he said 200 kilos, we backed off because we didn't know. But you have to understand what the evidence is. There were four recorded conversations in the midst of the conspiracy and after the conspiracy where that cooperator, in November of 2005, he's recorded telling another cooperator, and he's the person recording. He's the person with the recording device. Tells another cooperator, I don't know what Junior is the person who received the cocaine and was shifted. I don't know what Junior did with the cocaine. In April of 2006, there's another recorded conversation. See, my time is up. Yeah. There's another recorded conversation where, again, there's the cooperators who are recording the conversations are saying, we don't know what happened to the, not even one of them talks about shipping into the U.S. And that's another thing. We always, to this day, we don't know when this witness learned that 200 kilos had been shipped to the United States. Because throughout the trial, throughout the recorded conversations, there's not a single supporting recording about 200 kilos having come to the U.S. And, as I say, during his direct examination, he never testified. But what would you have done with this document, the cross-examination, if you had? We could have objected to the testimony as fear said. Because, as I say, we didn't know. All the evidence we had, all the DEA successes we had, never mentioned a 200 kilo shipment. But if somebody testifies that something happened and there's no foundation for it, did they just say, well, 200 kilos went to the U.S., then you don't need the document to object to it as fear said. Right. You could say there's no foundation for that. We moved to strike it. But we don't know what his answer is going to be when we move to strike. Had we had this document in our hands? But this document wouldn't have impeached him. It wasn't even his statement. It was Junior's statement, and Junior's dead. This document, Junior, who was working with the witness, and who had known him for many years before this, that document would have allowed us to investigate and to be prepared for testimony, either to object on foundational grounds or to confront him with this 200 kilos were sent to Houston, and it was unbeknownst to Borda. Isn't that correct? So you would have confronted him with a statement that was made by somebody else to impeach him. We would have had a good faith basis for asking the question, and if he said, I don't know what you're talking about, we could have sought to refresh his recollection with the document. We don't need it to be his document to refresh recollection. So we could have had a good faith basis to ask the question and go down a road that we were unprepared to go. And two, we could have refreshed his recollection at a minimum, and three, we could have done more investigation with the case. Okay, thank you. We'll hear from the government. Good morning. May it please the Court, I'm Kirby Heller representing the United States. Let me just start with Ms. Skidmore's two sentences in her draft report of a debriefing of Junior, just to make clear the numbers that are involved in terms of kilograms. First, she says that Junior said Borda advanced 100 kilograms each to Junior and HB. And then after that, so that's 200 kilograms. And after that, she says, unbeknownst to Borda, Junior and HB took an additional 100 kilograms to sell. So that unbeknownst, first of all, is just talking about 100 kilograms. We have a load of 1,500 kilograms of cocaine in this palm oil deal, and Jute and Suarez at the trial did not say, and he was asked this when he answered in response to a question on cross-examination, where the 200 kilograms came from. We don't know if it's this 200 that Borda advanced. It's just 200 kilograms of this load. So there's no basis for assuming that any of these statements, especially the unbeknownst part, was what Suarez was testifying about. In any event, the evidence, the information was not material for the reasons that have been discussed. It wasn't admissible. It certainly doesn't say anything about what Borda knew about what Junior did with the rest of the load. It says he doesn't know what happened. He doesn't know about the 100 kilograms, but it doesn't say about what Borda knew about what Junior did with the rest of the load. And I think an inference is that the rest of it was beknownst to him that, in fact, it went to the United States. But couldn't this be seen as also saying that this additional 100 kilograms that they could sell in Houston for a larger profit? I mean, as I understand it, the government's theory here was that the reason that this was sold at the lower price, the so-called Mexico price, was because Junior was basically taking the risk of transporting it to the U.S. And with that risk, he could get the higher price, and that's why he was selling it at the lower price, because he was taking all the risk. Wasn't that the government's theory? The government's – yes, Your Honor, that is the government's theory. What he was selling it for was up to him. I think Borda had – Borda was upset that it wasn't – he wasn't getting his money quickly. But if that was the theory, then how is that theory consistent with this statement in the DEA-6, that they could – took an additional 100 kilograms because they could sell it in Houston for a larger profit? I mean, they could do that anyway under the government's theory, right? Well, they could do that, except this was 100 kilograms they were going to keep for themselves. They were going to – Borda wasn't going to know about it. They took it. They were going to sell it at the higher price. And then when there was an accounting, you know, they would then give back to Borda the money for it. But how are they selling it at a higher price? It's the same price that they would have been selling all the other kilograms for, right? Right, but the rest of it was Borda's cocaine. This was cocaine they were selling for themselves. But why does it say at the higher price? Well – I mean, Borda's cocaine that they were buying at the Mexico price, right? They were selling – they were buying it from him at the Mexico price. Under your theory, they were still going to transport it to the U.S. where they could sell it at the U.S. price, right? That was certainly – And that delta would be their profit, right? Yes, depending on how many middlemen there were, et cetera. But the theory was that he was going to sell it – he was going to sell it at the Borda so it then could be transported to the U.S. and sold at a higher price. So if this says that they were believing that they could sell it at Houston for a larger profit, then doesn't that suggest that they weren't selling the rest at the larger profit? Yeah, I understand Your Honor's question. So is that a guess? I don't – You understand my question? I understand your question. Do you agree with the premise? I don't agree with that interpretation of the statement. I think it's simply a statement of what they were going to do with this extra 100 kilograms. I don't think it says anything about – How do we interpret the sentence because they could sell it in Houston for a larger profit? What does that mean? It simply means that's what they were going to do with it. I don't think it suggests that that's not what they were going to do with the rest. I think the important part of that statement, if anything is important about that statement, is that they took this additional 100 kilograms – Couldn't it be a reasonable inference that that's not what they were going to do with the rest? I don't believe it's a reasonable inference. I think it simply – it says nothing about the rest of the lower – If I disagree with you on that, doesn't that make it Brady? Well, it might make it more exculpatory than the government believes it is, but we still get to the materiality question, which is it wasn't admissible and there isn't a reasonable probability, even if it somehow came in, that it would affect the verdict because it's so far removed from what we know about what Borda and Alvaron knew about this load. And I guess to add more context to that, because the sufficiency question is underlying a lot of these claims, the government did not rely on Suarez's statement in cross-examination about 200 kilograms coming to New York as the crux of its case. The government was very careful to, in fact, build almost an entire case on the defendants' own words of what they knew. The government didn't have to prove that they intended the cocaine to go to the U.S. The government didn't have to prove that they imported the cocaine into the U.S. It just had to prove that they knew that Junior and his confederates were intending for the cocaine to go to the U.S. And their statements on these recorded conversations makes that abundantly clear. I can go over that evidence. It's certainly outlined in our brief. That's two. And so, looking again at this one statement, I certainly would argue that that's really not going to put a dent into the evidence that showed they knew Junior was bringing this to the border. They said that. And they knew that Mexicans, like Junior, this is what they did. Borda says this directly. I was told this. This is what Mexicans do. They bring it to the border. They sell it at the higher price. They pay us the moderate price. And meanwhile, we're sitting here for two months and not getting paid. And he was obviously upset about that. Let me just straighten out a couple of facts about the instruction on the evidence that was struck. Mr. Borda's attorney asked that testimony be struck. And he said, basically, I don't know how you're going to do that. It would be hard. And, first, the court said, I'm not going to do that. But then the court made very clear, and that's at the joint appendix on page 283, that the jury should not consider the testimony. At that point, Mr. Borda's attorney said, well, at least say they shouldn't consider references to Juarez and it was Florida and Atlanta. And the court said, I'm not going to just highlight certain points. After all, some of Borda's testimony was stricken, too. That was references to Italy. And the court did not abuse its discretion in not taking this testimony, which would be very hard to summarize. In fact, almost infeasible by just saying don't consider this testimony and, of course, don't consider these exhibits. So why was the certified copy of the conviction of Mr. Borda admissible? Well, it was admitted under Rule 404B. The court primarily ruled to – Under what? What part of 404B? I mean, under what theory? Was it to prove intent, motive, absence of mistake? Which one? Well, I think the government's theory was that it showed that he was familiar with the drug market in the United States. The court added that it also corroborated Montoya's testimony about how he met Borda. So which prong of 404B did those fall under? Well, the first would be knowledge, not knowledge of the crime, but knowledge of the United States market to show that – so that Borda could not claim I just shipped to Mexico, I'm a Colombian, I shipped to Mexico, I have no idea about drugs in the United States. Now, that claim wasn't made, but as a hedge against that, that was the government's theory. So that's the knowledge prong. The court doesn't fit under one of those. What instruction was given to tell the jury that that's what it was used for? The court didn't give a specific instruction about – it said – I believe it gave the usual instruction on 404B. It said this conviction – I believe it said the conviction was admitted. You can't consider it for his guilt on this crime. I don't remember the court's exact words. So how does that tell the jury what they should or shouldn't do with this conviction? Well, I believe the court gave an instruction on 404B that you can consider it – I think the court said for knowledge. It didn't say much more. But I should add that this conviction was only briefly even mentioned when it was introduced. It was introduced just as a certified document. It was not brought up at all by the government in its summations. And Borda, in his own tape-recorded statements, admitted that he had been a drug dealer in the United States. So that fact was already before the jury. Montoya, again, talked about how they met in prison. And even if it was error to admit it, it was certainly a harmless error. Your answer to Judge Wilkins confused me. My notes say that the district court did give a curative instruction telling them to evaluate the prior conviction for only intent and knowledge, not for any inference of guilt. Is that wrong? Yes, Your Honor, that's correct. I'm sorry if I didn't make that. So your answer to Judge Wilkins should have been, yes, the judge did give a curative instruction. The judge, yes. And I certainly meant that. Thank you. If there are no other questions, then we will rest on our brief. Thank you. Let's see. Ms. Brandenburg and Ms. Hernandez, I think they were out of time, right? Oh, you did? Oh, you can use your one minute. And Ms. Hernandez, you can have one also. Thank you. To address the government's issues on the prior conviction, this circuit is very conservative in admitting evidence of other crimes, admitting that they're highly prejudicial, that other convictions can be misused by the jury to show some propensity. And is our contention that the familiar with the drug trade use for the prior conviction gets dangerously close to propensity? If not, it's there. Our contention is that it's there. Any more than in every case? Well, I think the analysis in the Edwards case from the Tenth Circuit is helpful here, where possession was not equal to distribution, so a prior conviction for possession is not admissible for a distribution conspiracy. It's similar here, where a distribution conspiracy conviction, which was the prior with Borda, is not equal to the importation. You know, it's a higher standard, a higher level of evidence, higher level of intent. And the Tenth Circuit would be persuasive there. So it's only where the prior conviction is somehow evaluated as being equally or less serious? Well, similar in some way. And there was no – Well, this is – I mean, at a slightly more general level, both the prior conviction and the current charge deal with distribution. Well, I think that that's where you get to propensity. You know, if you're making the inference that if this person has been guilty in the past of distributing drugs in the United States, then they must be – And he knows how to distribute drugs. And he must be guilty of also importing them to the United States. And that's where the danger of admitting other crime evidence comes into play. Thank you. Thank you. Your Honor, the government, in argument, just said that they relied on more evidence than this 200 kilos. And in their brief, they point to five things. Simple geography. And that, again, goes to this closing argument with the bees. They didn't have an expert here, unlike there was an expert in the other case, in the Vega case that the government just cited in their Rule 28-J. There was no expert here testifying as to what the roots were. They relied on the fact that the drugs were moved to Monterey. But that – the testimony was that it was moved to Monterey because that's where Junior lived. And he knew the area. He knew the Mexican police. He was able to negotiate more easily. That the money was paid in U.S. dollars. But the undisputed testimony was that no one knew exactly how the money came down. All they knew is that when it arrived in Mexico City, it arrived through a money exchange house. And at that point, it was in dollars. So nobody knew how Junior handed over the money. And then the cooperators' testimony. If I might say one other thing, Your Honor. The DEA-6, the Skidmore DEA-6 is an 11-page document that talks about shipments of cocaine to the United States, not in relation to Mr. Borda. And we should probably submit it to the court for review. And there's a lot of inferences. There's a lot of information that is in the two paragraphs about Mr. Borda's shipments with Junior that could have been used to help us. Including, for example, we don't – including the paragraph before that we haven't been citing to. It says that the drugs were shipped to – that Junior sold the drugs to three different Mexicans in Mexico. It doesn't say that it was shipped to the United States. And then there's this paragraph about the 200 kilos. The reason we focus on the 200 kilos is because that's the testimony that the judge relied on in order to make a finding of relevant conduct and in order to find that there was sufficient evidence not to give us a new trial. Thank you, Your Honor. Thank you. The case is submitted.
judges: Tatel, Wilkins, Ginsburg